# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

DAVID G. IVERSON,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. C05-0104

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits and supplemental security income benefits. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The matter is remanded to the Commissioner of Social Security.

### Procedural Background

Plaintiff David Iverson applied for Title II and Title XVI social security benefits on January 8, 2002, alleging an inability to work since January 2, 2001, due to back problems and left leg pain. Both applications were denied initially and also subsequently denied on reconsideration. A hearing before Administrative Law Judge (ALJ) Thomas M. Donahue was held on January 27, 2005. The ALJ denied benefits. On April 22, 2005, the Appeals Council denied the plaintiff's request for review. Thus, the ALJ's decision is the final decision of the Commissioner in this case.

## Factual Background

The plaintiff was born on September 28, 1963. (Tr. 409). He graduated high school and completed additional employment-related training. (Tr. 33). The plaintiff had past relevant work experience as a cashier, security guard, stockman, and cook. (Tr. 141). The plaintiff was last employed as a certified nursing assistant until January 2, 2001, followed by a brief attempt to return to work in a lesser capacity. (Tr. 43-44).

The plaintiff first injured his back in the army. (Tr. 267). He received a medical discharge due to his back condition in 1985. (Tr. 267). The plaintiff began experiencing low back pain in 1990 and that led to a L5-S1 laminectomy/discectomy. (Tr. 266). This surgery relieved much of the plaintiff's low back and leg pain until early 1994, when he began experiencing back pain and pain radiating down his left leg to his foot. (Tr.266). In 1994, the plaintiff had a L5-S1 neurolysis and repeat discectomy for recurrent herniation. (Tr. 215).

On January 9, 2001, the plaintiff presented to Janice Taylor, a physician's assistant at the Des Moines Veteran's Affairs ("VA") emergency room with lower back pain. (Tr. 221). The plaintiff stated that he had had minimal problems with his back since his surgeries, but had been experiencing pain in his back, left buttocks, and left leg for the past week. He noted that he had not had an accident, but simply woke up with the pain one morning. (Tr. 222). The plaintiff rated his pain as a 7 on a scale of 1-10. (Tr. 222). Ms. Taylor noted that the plaintiff moved slowly and stiffly and was in obvious discomfort. (Tr. 221). The plaintiff had X-rays taken of his spine by Dr. Keith Madison. (Tr. 235). Dr. Madison found that the L5-S1 disc had narrowed by at least 50%. (Tr. 235).

The plaintiff returned to the Des Moines VA emergency room on January 16, 2001, with the same symptoms and a pain level of 8. (Tr. 218-19). Ms. Taylor noted that the plaintiff still moved stiffly and slowly and that he exhibited an obvious muscle spasm around his surgical scar. (Tr. 218). Ms. Taylor diagnosed the plaintiff with left sciatica

and prescribed codeine (300MG every 6 hours) for his pain and cyclobenzaprine (10MG three times per day) for his muscle spasm. (Tr. 219).

On January 23, 2001, the plaintiff visited the Des Moines VA emergency room to request a note to be excused from work until his orthopedic appointment the next month. (Tr. 216). The plaintiff stated that there were no sit down jobs available for him at his place of work. (Tr. 216). Ms. Taylor observed that the plaintiff was walking stiffly and slowly with the aid of a cane. (Tr. 216). Ms. Taylor instructed the plaintiff to avoid lifting, repetitive bending, and prolonged standing until his appointment on February 13th. She noted that a sit down job would be "okay" for the plaintiff. (Tr. 216). Ms. Taylor also refilled the plaintiff's prescriptions of codeine and cyclobenzaprine. (Tr. 217).

The plaintiff saw Dr. Karen E. Evensen at the orthopedic clinic in Des Moines on February 13, 2001, for a consult. (Tr. 215). The plaintiff stated that he had been laying flat "80% of the time" with some relief. (Tr. 215). Dr. Evensen observed that the plaintiff had a slow gait, was able to walk on his heels, but had difficulty walking on his left toes. (Tr. 215). The plaintiff exhibited decreased strength during repetitive left toe raises and had very subtle left calf atrophy. (Tr. 215). Dr. Evensen noted that the plaintiff was resistant to continued management of his pain with Tylenol #3 and Flexeril and scheduled an MRI to evaluate further. (Tr. 215).

The plaintiff had an MRI of his spine taken on February 15, 2001, by Dr. William C. Young at the Iowa City VA. (Tr. 233). Dr. Young noted that there was very mild degenerative spondylolisthesis at L5-S1, but that disc degeneration at L5-S1 was moderate to moderately severe. The plaintiff also showed a small amount of herniation of dis material into the sacrum and spur formation of the vertebral endplates and from the superior articulating facet of the S1 segment. (Tr. 233).

Another MRI was performed on February 22, 2001, by Dr. Ronald Bunten in the orthopedic clinic at the Des Moines VA. (Tr. 212). Dr. Bunten noted the MRI showed a swollen L5 root and stenotic foramen on the L5-S1, secondary to the plaintiff's surgery

scar. (Tr. 212). Dr. Bunten recommended epidural injections to treat the plaintiff's condition. (Tr. 213).

On February 28, 2001, the plaintiff visited the pain clinic at the Des Moines VA to receive an epidural steroid injection. The plaintiff stated that this procedure lowered his pain level. (Tr. 211-212). On his next pain clinic visit on March 14, 2001, the plaintiff stated that his pain level was a 2. He was given another steroid epidural at that visit. (Tr. 211). The patient received a third epidural steroid injection on March 30, 2001. (Tr. 210).

The plaintiff called the Des Moines VA on April 11, 2001, to discuss continued pain after his last epidural steroid injection. (Tr. 209). Suzanne Turner, an nurse in the orthopedic clinic, spoke with the plaintiff later that day. (Tr. 208). The plaintiff stated that he did not think the epidural steroid injections helped with his back pain and asked for a referral to the Iowa City Neurosurgery Clinic. (Tr. 208).

The plaintiff had his initial consultation with Dr. Daniel J. Guillaume at the Iowa City Neurosurgery Clinic on July 26, 2001. (Tr. 204-207). The plaintiff informed Dr. Guillaume that he had experienced little pain relief with Tylenol #3 and his muscle relaxant and stated that any activity was bothersome. (Tr. 204). Dr. Guillaume noted in the plaintiff's physical examination that his strength was full except "left ip 4 secondary to pain." (Tr. 205). He also noted that the plaintiff had decreased sensation in his left S1 and mildly in L5. (Tr. 205). The plaintiff's gait was described by Dr. Guillaume as "antalgic." (Tr. 205).

Dr. Stanley Parker took X-rays and an MRI of the plaintiff's spine during his initial consultation. (Tr. 232). Dr. Parker found that they showed some mild narrowing at L5-S1, otherwise he noted no other evidence of problems. (Tr. 232). After Dr. Guillaume reviewed the X-rays and MRI he diagnosed the plaintiff with left S1 radiculopathy and prescribed neurontin and lortab. (Tr. 206). Dr. Guillaume also scheduled RTC to occur six weeks later. (Tr. 206). After a discussion with Dr. Howard, Dr. Guillaume noted that

if the plaintiff's pain was not able to be managed by RTC, he would offer a re-exploration of the left L5-S1.  (Tr. 206).

The plaintiff had a follow-up MRI taken by Dr. Young on October 2, 2001. (Tr. 230).  Dr. Young noted that the appearance of the plaintiff's spine was nearly identical to the MRI taken on February 15th.  He stated that there was bony dominant left lateral recess and neural foraminal stenosis at L5-S1.  (Tr. 230).  He also noted that there was some disc bulging due to scar material in the posteriolateral disc.  (Tr. 230).

Dr. Guillaume requested a consult by Dr. Aul to recheck for evidence of radiculopathy.  (Tr. 199).  In his October 30, 2001, examination, Dr. Aul found that the left lower extremity muscles were normal and there was minor denervation of bilateral lumbosacral paraspinals, attributable to the plaintiff's prior surgery.  Dr. Aul found no convincing evidence of lumbosacral radiculopathy.  (Tr. 195).

The plaintiff visited Iowa City neurosurgery for a follow-up on November 15, 2001. (Tr. 189-93).  Dr. Guillaume noted that the plaintiff's left side pain had worsened since his last exam and the plaintiff had also began experiencing pain on his right side. (Tr. 189).  The plaintiff stated that his pain level was a 9.  (Tr. 190).  Dr. Guillaume reviewed the plaintiff's MRI's with Dr. Traynelis and determined that there was no surgical lesion and that the plaintiff's pain was due to scar tissue surrounding the left S1 root. (Tr. 190).  Drs. Guillaume and Traynelis determined that surgery was not necessary and referred the plaintiff to the pain clinic.  (Tr. 190).

The plaintiff visited Michael Farley, a physician's assistant at the Des Moines VA, on December 20, 2001.  (Tr. 182-85).  Mr. Farley noted that the plaintiff walked with a limp and had poor posture due to his discomfort.  (Tr. 182).  The plaintiff stated his pain was an 8 and his right leg pain had increased.  (Tr. 183).

On January 8, 2002, the plaintiff completed an application for supplemental security income.  (Tr. 409-14).  The plaintiff noted on his disability report that he was unable to "stand, walk, sit or lye (sic) down for any amount of time due to pain."  (Tr. 118).  The

plaintiff stated that he stopped working because of pain that began in his back and then radiated down his left leg. (Tr. 118). The plaintiff also stated that he tried to work as a monitor three months after he initially stopped working, but could not stand the pain. (Tr. 118). The plaintiff also stated that he would like to receive rehabilitation services to help him get back to work. (Tr. 124).

Arlys McCauley completed the plaintiff's disability interview on January 8, 2002. (Tr. 127-30). Ms. McCauley observed that the plaintiff "grimaced throughout the interview" and "his body would jerk periodically as if he was in pain." (Tr. 129). Ms. McCauley also noted that the plaintiff walked slowly and with the aid of a cane. (Tr. 130).

The plaintiff filled out a personal pain and fatigue questionnaire on January 24, 2002. (Tr. 131-35). The plaintiff noted that he had difficulty sitting for more than an hour in a reclined position, sitting upright for more than 10 minutes, standing for more than 15 minutes, lying down for more than 2 hours, and walking more than 50 feet. (Tr. 131, 134). He stated that he felt pain 24 hours a day 7 days a week. (Tr. 131). The plaintiff stated that he was limited in his ability to bend over and pick things up below his waist, which made his daily life difficult. (Tr. 133). He stated that in a regular week he took the garbage out on Monday for pick-up, checked his email every third day, visited friends once a week, did laundry every other week, and went shopping twice a month. (Tr. 134).

In his daily activities questionnaire, dated January 31, 2002, the plaintiff noted that showering caused him a lot of pain because he had to stand for a long period of time. (Tr. 136). He also noted that he had difficulty sleeping more than 2 hours at a time. (Tr. 136). The plaintiff stated that he regularly did laundry and rarely did the dishes, changed the sheets, or washed his car. (Tr. 136). The plaintiff stated that he has had to adjust many daily activities due to his pain. (Tr. 137). He explained that he was only able to cook two quick meals a day and needed assistance grocery shopping. (Tr. 137).

A consultative examination was performed by Dr. Kyle Christiason on March 11, 2002. (Tr. 240-44). Dr. Christiason noted that the plaintiff moved with the aid of a cane and had a difficult time standing upright after sitting, due to pain. (Tr. 240). The plaintiff stated that many maneuvers caused discomfort in his back and legs. (Tr. 240). Dr. Christiason stated that the plaintiff could lift less than 10 pounds from the floor, could stand for 20-30 minutes, could sit for 10 minutes at a time, and could walk for less than one block. (Tr. 241). The plaintiff stated he was much more comfortable in a recliner and was able to take less pain medication when he could recline. (Tr. 242). The plaintiff exhibited less than normal forward flexion and backward extension of his hips. The plaintiff could not fully extend or flex his spine or his neck. (Tr. 244). Dr. Christiason noted that the plaintiff could only walk on his toes and heels with assistance and was unsteady when he first stood upright. (Tr. 244).

On March 13, 2002, Dr. Nitin Shirodkar took X-rays of the plaintiff's spine. (Tr. 270-71) Dr. Shirodkar noted that the plaintiff's test showed evidence of back problems including mild Grade I spondylolisthesis at L5-S1 with break in the pars interarticularis of the L5 vertebra. (Tr. 270-71) He also noted mild scoliosis of the spine. (Tr. 271). When Michael Johnston, physician's assistant, reviewed the X-rays he noted there was evidence of mild spondylolisthesis at L5-S1 with break in the pars interarticularis of L5 vertebra. (Tr. 262).

A compensation and pension examination was performed by Mr. Johnston on March 15, 2002. (Tr. 264-68). Mr. Johnston noted that the plaintiff complained of "full-time" low back pain and pain radiating down the left leg to his foot. (Tr. 266). The plaintiff stated that he tried to walk each day, but any prolonged standing or sitting increased the intensity of his pain. (Tr. 266). Mr. Johnston noted that the plaintiff "rises from the chair with great caution putting his hands on his knees, and ambulates quite slowly after gaining an erect position." (Tr. 266). Mr. Johnston stated that the plaintiff's back had limited motion with 60 degrees of flexion and 5 degrees of extension. (Tr. 266). When the

plaintiff was in a lying position, he noted increased low back pain and pain in his left thigh when he performed a straight leg raise. (Tr. 265). Mr. Johnston determined that the plaintiff's problems were due to mechanical low back pain and disc problems. (Tr. 265).

On March 28, 2002, Dr. Gary J. Cromer performed an RFC assessment. (Tr. 245-54). Dr. Cromer found that the plaintiff could lift 10 pounds occasionally and frequently, could stand or walk for at least 2 hours in an 8-hour workday, could sit for about 6 hours in an 8-hour workday, and was unlimited in his pushing and pulling abilities. (Tr. 246). Dr. Cromer noted that the plaintiff was able to do his own laundry, take out the trash, run errands, and drive. (Tr. 253). Dr. Cromer stated that the plaintiff's reports are somewhat inconsistent with what he told Dr. Christiason and his DDSB report. (Tr. 254). Dr. Cromer stated that the plaintiff's description of his pain and limitations is inconsistent with his spinal range of motion measured by Dr. Christiason. (Tr. 254). Dr. Cromer questioned the plaintiff's credibility based on these inconsistences and noted that at Dr. Christiason's consultive examination the plaintiff was neurologically intact. (Tr. 254).

Tim Natelborg reviewed the plaintiff's application, along with Dr. Cromer's March 28, 2002, RFC. (Tr. 409). Mr. Natelborg found that because the plaintiff had use of his arms and legs, adequate range of motion in his back, and was still able to perform a variety of household tasks, he would be able to perform work that did not require heavy lifting or long periods of standing or walking. (Tr. 415-16). Therefore, Mr. Natelborg denied the plaintiff's application for supplemental security income. (Tr. 416).

The plaintiff submitted a request for reconsideration on April 26, 2002. (Tr. 71-72). In his reconsideration disability report, the plaintiff noted that his pain had increased and his daily functioning had decreased. (Tr. 155-56). He stated that he was only able to take a shower every three to four days and only able to fix one meal a day due to his back pain. (Tr. 156). The plaintiff noted that he had been unable to work because of back pain and his disability level had been increased by the VA. (Tr. 71).

On August 12, 2002, the plaintiff completed a second personal pain/fatigue questionnaire. (Tr. 161-66). The plaintiff noted that the "constant pain [had] increased and the frequency of the peak of pain [had also] increased." (Tr. 162). The plaintiff stated that he could walk about 50 feet, stand for 10 minutes, sit in a recliner for 30 to 45 minutes, and sit in an upright position for 5 to 10 minutes. (Tr. 164).

On June 25, 2002, the plaintiff visited the pain management clinic at the Des Moines VA. (Tr. 257, 261). Dr. Richard Leth noted "exquisite pinpoint tenderness not only over the lumbar facets, but also over the sacroiliac joint bilaterally." (Tr. 261). Dr. Leth recommended treatment of radiofrequency denervation of the lumbosacral spine. (Tr. 261).

Mr. Farley responded to a telephone call from the plaintiff on July 17, 2002, regarding renewal of his handicapped parking permit. (Tr. 260). Mr. Farley found that the plaintiff met the criteria for a permanent handicapped parking permit on the basis of his compensation and pension examination. (Tr. 260). Mr. Farley noted that a permanent permit was recommended because the plaintiff's condition would not improve. (Tr. 260).

The plaintiff underwent radiofrequency denervation on July 19, 2002. (Tr. 270). Prior to the procedure, the plaintiff stated that his pain was at an 8. (Tr. 259). At discharge the plaintiff stated that his pain was down to a 5 or 6. (Tr. 258). When Joyce Schmitz, staff nurse, called the plaintiff to follow up, he stated his pain was at a 3 when he got home, but went up to a 7 shortly thereafter. (Tr. 258).

Ten days later, on July 30, 2002, the plaintiff returned to the pain clinic for a follow-up. (Tr. 305, 307). The plaintiff noted that, overall, his pain had improved, but he still had a "severe, sharp pain in the left sacroiliac or buttock area." (Tr. 307). Dr. Leth noted that the sacroiliac join was "exquisitely tender." (Tr. 307). Because sacroilitis frequently develops in patients with chronic mechanic back pain, Dr. Leth gave the plaintiff a sacroiliac injection. (Tr. 307).

A second RFC assessment was performed by Dr. John May on September 9, 2002. (Tr. 280-88). Dr. May found that the plaintiff could occasionally lift 10 pounds and frequently lift less than 10 pounds. (Tr. 281). Dr. May found that the plaintiff could stand for at least 2 hours in an 8-hour workday and could sit for about 6 hours in an 8-hour workday. Dr. May noted that the plaintiff's ADL's on August 12, 2002, revealed the same standing and walking restriction for the plaintiff (able to sit for 30-40 minutes in a reclined position, but only 5-10 minutes sitting upright). (Tr. 288). However, Dr. May noted that the plaintiff could drive for 25 miles and shop for groceries. (Tr. 288). Finally, Dr. May stated that, for the most part, the plaintiff's allegations were consistent with the record and credible. (Tr. 288).

The examiner reviewed Dr. May's September 9, 2002, RFC before denying benefits. (Tr. 419). The examiner found that the evidence showed that the plaintiff was able to move his back, arms, and legs adequately and perform household activities. (Tr. 420-21). The examiner noted that the plaintiff could perform work that did not require him to stand for long periods of time. (Tr. 421). It was determined that the plaintiff could perform the following jobs: call out operator, DOT #237.367-014; telephone quote clerk, DOT #237.367-046; and charge account clerk, DOT #205.367-014. (Tr. 424).

The plaintiff returned to the pain clinic on October 11, 2002, to receive radiofrequency denervation on the right side of his back. (Tr. 307). The plaintiff stated that his pain was at a 7 prior to the procedure. (Tr. 307). After the procedure, the plaintiff stated that his pain was at an 8, but after he took his pain medication it was down to a 5 or 6. (Tr. 308).

On November 6, 2002, Keith Barcus, LPN at the Des Moines VA, noted that the plaintiff continued to have lower back pain since radiofrequency denervation, but his pain had dropped significantly - down to a 3. (Tr. 300-02).

The plaintiff submitted a request for a hearing by an ALJ on November 14, 2002. (Tr. 77-78). The plaintiff noted that he was still unable to work. He stated that he could not "stand, sit, or walk for any extended time." (Tr. 77). The plaintiff also stated that he had to sleep in his recliner because of the pain. Finally, the plaintiff noted that he could only perform household activities or drive with assistance and frequent rest. (Tr. 77).

The plaintiff called the Des Moines VA on January 23, 2003, and again on February 21, 2003, to request stronger pain medication because his pain medication was not adequately controlling his pain. (Tr. 350-51).

The plaintiff underwent several acupuncture treatments between May 14, 2003, and October 31, 2003. (Tr. 312-345). The plaintiff generally found much initial pain relief following the treatments, but the relief lasted only a week before his pain level increased. (Tr. 326, 329, 335, 341). However, the treatments did reduce the plaintiff's pain level from a 9.5 on May 14th to a 3 on July 11th (Tr. 326, 347).

The plaintiff visited the Des Moines VA for a regular appointment on July 1, 2003. Mr. Barcus noted that the plaintiff's pain level had gotten a little better since he started acupuncture treatment, but felt that a weekly treatment would be better. (Tr. 335). The plaintiff stated that his pain level was at a 5. (Tr. 334).

A consultation with the Iowa City pain clinic was scheduled on September 17, 2003. (Tr. 320-22). Dr. Jaroslaw Przybyl found that plaintiff was a good candidate for a spinal chord stimulator "since he has failed interventional treatments before and meds do not control his pain very well." (Tr. 320).

The plaintiff underwent a psychiatric evaluation at the Iowa City VA on November 4, 2003, prior to his neurostimulator procedure. (Tr. 311-12). Dr. Joe Barrash noted that the plaintiff denied non-medical factors contributing to his pain such as financial or psychosocial incentives, alcohol or substance abuse, or depression. (Tr. 311). Dr. Barrash also noted that the plaintiff's expectations for treatment were reasonable, but was concerned that the plaintiff's expectation that he could ride his motorcycle after the

procedure may have been unreasonable. (Tr. 311). Dr. Barrash found that the plaintiff had symptoms of mild depression, but that he did not show any "clear psychological or behavioral contraindications to [the] procedure." (Tr. 311).

A spinal chord stimulator was implanted on January 9, 2004, at the Iowa City pain clinic. (Tr. 404). On January 16, 2004, the plaintiff saw Dr. Przybyl for a follow-up and stated that he had more than 50% pain relief in his lower extremities and back with the stimulator. (Tr. 397). Dr. Przybyl noted that the plaintiff was a good candidate for a permanent spinal chord stimulator. (Tr. 398).

The plaintiff underwent a pre-operation evaluation on February 9, 2004, before implantation of his permanent spinal chord stimulator. (Tr. 392-93). The plaintiff stated that he had a 75% reduction in pain with the trial spinal chord stimulator. (Tr. 392) He noted that his pain level was at an 8 on that day. (Tr. 393).

On February 17, 2004, a permanent spinal chord stimulator was implanted into the plaintiff's back by Dr. Meryl Severson at the Iowa City VA (Tr. 378). Dr. Severson instructed the plaintiff not to lift more than five pounds. (Tr. 378). Dr. Severson noted on February 26, 2004, that the plaintiff initially had excellent pain relief, but got into a "tug of war argument with his girlfriend" and had been experiencing a buzzing sensation in his leg since. (Tr. 377).

The plaintiff returned to the Iowa City pain clinic on July 16, 2004, for a follow-up exam following the implantation of the spinal neural stimulator in February. (Tr. 366-67). The plaintiff stated that "the device is working very well and [provides] excellent pain relief." (Tr. 366). Dr. Przybyl also noted that the plaintiff had reduced his intake of Methadone in response to his pain relief. (Tr. 366).

On July 29, 2004, the plaintiff visited the Des Moines VA for a routine examination. (Tr. 362-65). Mr. Farley noted that the plaintiff walked tentatively and changed positions cautiously. (Tr. 363). However, Mr. Farley also noted that the plaintiff's movement was improved. (Tr. 363). Mr. Barcus found that the plaintiff had

continued swelling in both legs. (Tr. 363). The plaintiff stated that his pain level was at a 3. (Tr. 365).

The plaintiff completed a questionnaire on August 30, 2004, in preparation for his hearing before the ALJ. (Tr. 170-72). The plaintiff noted that he could stand for 20 minutes, walk 5 to 10 yards, drive a car 30 miles, carry objects less than 5 pounds, ride in a car for 20 miles, and lift things less than 5 pounds. (Tr. 171). The plaintiff stated that he had a limited ability to do the following: go shopping, perform daily home chores, reach for things, pull things, see satisfactorily, and grip with his hand. (Tr. 171).

The plaintiff testified at his September 2, 2004, hearing before the ALJ. (Tr. 33-56). The plaintiff stated that he was injured because of the repetitive lifting of residents and stooping during his job as a certified nursing assistant. (Tr. 35). The plaintiff testified that his doctors at the Des Moines and Iowa City VA had not released him to work at a job which involved less lifting. (Tr. 35). He noted that his doctors said this was "due to [his] inability to get comfortable without severe pain." (Tr. 35). The plaintiff also testified that his doctors had told him not to lift more than five pounds. (Tr. 35).

As to his abilities, the plaintiff testified that he could sit for 10-15 minutes, stand for 20 minutes, walk 20-30 yards, drive 25 miles, and shop with assistance. (Tr. 36, 49). The plaintiff also testified that he could ride an adapted motorcycle for 25 miles. (Tr. 49). The plaintiff stated that the spinal chord stimulator implant controls the pain to a limit, but he is still in pain 24 hours a day. (Tr. 37-38). The plaintiff testified that while Ms. Taylor suggested that a sit down job might be appropriate, none of his treating physicians had suggested this since. (Tr. 45).

The plaintiff testified that he felt some pain relief from the acupuncture treatments (if they were done weekly) and the spinal chord stimulator. However, no treatment helped his mobility or strength. (Tr. 46).

Vocational Expert, Carma Mitchell, also testified at the plaintiff's hearing. (Tr. 56-61). The ALJ proposed three hypotheticals to Ms. Mitchell. (Tr. 57-60). The first

hypothetical concerned the same education and work experience as the plaintiff who could lift 10 pounds occasionally, 5 pounds frequently, sit for up to 2 hours at a time for a total of 8 in an 8-hour workday, stand for 2 hours of an 8 hour workday, walk 3 blocks, occasionally balancing, stooping, kneeling, crouching, crawling, and bending. (Tr. 57). Ms. Mitchell stated that if the plaintiff matched this hypothetical he could return to his past work as a customer service clerk, as he performed it and as performed in the national economy. (Tr. 57). Ms. Mitchell noted that the plaintiff possessed transferrable skills that would allow him to work as an appointment clerk, order clerk, or information clerk. (Tr. 58).

In the second hypothetical, the ALJ proposed the same characteristics as above, except it involved sitting 30 minutes at a time for 6 hours in an 8-hour workday, standing for 20 minutes at a time for 2 hours in an 8-hour workday, and lifting 5 pounds occasionally and frequently. (Tr. 58). Ms. Mitchell testified that if the plaintiff matched this hypothetical he would not be able to perform his past work of customer service as he did it or as it is performed in the national economy. (Tr. 59). She stated that generally for there to be transferrable skills into sedentary work, lifting of ten pounds would be required. (Tr. 59). She did testify, however, that she had seen some jobs where a person did not have to lift 10 pounds, such as an information clerk or appointment clerk. (Tr. 59).

Finally, the ALJ proposed a hypothetical involving lifting 10 pounds occasionally, 5 pounds frequently, sitting for 30 minutes at a time for up to 6 hours in an 8-hour workday, standing for 20 minutes at a time for a total of 2 hours in an 8-hour workday, and walking for 20-30 yards. (Tr. 60). Ms. Mitchell testified that if the plainitff possessed these abilities, he could perform customer service work as he had done in the past and as performed in the national economy. (Tr. 60). She also stated that the plaintiff would have the same transferrable skills into the jobs that corresponded with the first hypothetical.

The plaintiff's attorney asked Ms. Mitchell if her answers to the second and third hypotheticals would change if the sitting requirements had to be done in a reclined position. (Tr. 61). Ms. Mitchell responded that it "would make it difficult to complete tasks in a timely manner…[in jobs such as] a customer service clerk or an information clerk, order clerks." (Tr. 61).

## Conclusions of Law

### Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since January 2, 2001. At the second step, the ALJ found that the plaintiff was impaired by disorders of the back, which he determined were severe. At the third step, the ALJ determined that the plaintiff's impairments were

not equivalent to one of the listed impairments. At the fourth step, the ALJ determined the plaintiff had the following residual functional capacity (RFC):

> [T]o perform the exertional demands of sedentary work, or work which requires maximum lifting and push/pull of 10 pounds and frequently lifting of up to 5 pounds. He can sit for 6 hours total for 30 minutes at a time, and stand for 2 hours total for 20 minutes at a time in an 8-hour workday with normal breaks. The evidence supports a finding that the claimant has significant limitations which narrow the range of work he can perform. The claimant retains the capacity to only occasionally climb, balance, stoop, or kneel.

The ALJ determined that the plaintiff is able to perform his past relevant work of a customer service clerk, as performed by the claimant and as generally performed in the national economy. Based on his RFC, the ALJ determined that the plaintiff was also able to perform work which exists in a significant number in the national economy, including call out operator and charge account clerk. Therefore, the ALJ determined that plaintiff was not under a disability at any time through the date of his decision.

## Subjective Allegations of Visual Impairment

The plaintiff argues the ALJ improperly rejected the plaintiff's subjective allegations of back pain. When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Where the ALJ seriously considers, but for good reason explicitly discredits

a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

In evaluating the plaintiff's credibility, the ALJ fulfilled his obligation to make express credibility determinations and to set forth the inconsistencies in the record which caused him to reject the subjective complaints. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ need only acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints. Id. In the present case, the ALJ expressly acknowledged that he considered a variety of factors, including Polaski, in reaching its credibility determination. (Tr. 16-17).

The ALJ noted that nothing in the medical opinions and notes in the record support the plaintiff's allegations of pain that preclude all types of work. (Tr. 16). While it was often noted that the plaintiff moved slowly and in pain, the diagnoses of the plaintiff's several treating physicians were generally mild to moderate in nature. (Tr. 129-130, 182, 215-16, 218, 221, 240, 266). Dr. Madison found that X-rays demonstrated that the plaintiff had 50% L5-S1 disc narrowing. (Tr. 235). Dr. Young noted very mild degenerative spondylolisthesis at L5-S1, with disc degeneration that was moderate and a small amount of herniation of the disc material into the sacrum. (Tr. 233). Dr. Guillame noted that the plaintiff had full strength except "left ip 4 secondary to pain." (Tr. 205). Dr. Parker found mild narrowing at L5-S1, but no evidence of any other problems. (Tr. 232). Dr. Aul found normal left lower extremity muscles with minor denervation of bilateral lumbosacral paraspinals, attributable to the plaintiff's prior surgery. (Tr. 195). Dr. Traynelis determined that there was no reason for surgery to correct the plaintiff's injuries and found that the plaintiff's pain was due to scar tissue surrounding the left S1 root. (Tr. 190). Dr. Shirodkar found mild Grade I spondylolisthesis and mild scoliosis. (Tr. 270-71).

In addition, the ALJ noted that the plaintiff's "conditions that can be reasonably regulated by medication cannot constitute a basis of disability." (Tr. 16). The plaintiff

continually experienced pain relief from his medication, (Tr. 308), from epidural steroid injections, (Tr. 211-12), from radiofrequency denervation, (Tr. 300-02), from acupuncture treatments (Tr. 326, 329, 335, 341), and from the spinal chord stimulator implant, which the plaintiff stated reduced his pain by 75%. (Tr. 392-93, 397).

Furthermore, the ALJ found that the plaintiff's daily activities were inconsistent with his allegations of impairment. (Tr. 17). The plaintiff stated that he was able to do household chores, visit friends, go grocery shopping, and even ride his motorcycle. (Tr. 77, 134, 136-37, 171).

The ALJ's evaluation of the plaintiff's subjective complaints under the Polaski factors are set forth in the record and are supported by inconsistencies in the evidence as a whole. Thus, the ALJ's decision to discount the plaintiff's subjective allegations was appropriate.

Development of the Record

The plaintiff argues that the ALJ failed to develop the record fully and fairly because he did not obtain RFC Assessments from the plaintiff's treating physicians. This court agrees. Because the social security disability hearing is non-adversarial, the ALJ has the duty to develop the facts of the case. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). However, the ALJ need not seek clarifying statements or additional information unless a crucial issue is undeveloped. Id.

The issue in the plaintiff's case concerns two aspects of the plaintiff's abilities: the amount of weight he is able to lift and the amount of time he is able to sit upright, in a non-reclined position. There are discrepancies between the plaintiff's testimony and the RFC assessments completed by the disability determination service physicians. This is a crucial issue because, in response to the ALJ's second hypothetical (in which the plaintiff could only lift 5 pounds occasionally and frequently and sit for 30 minutes at a time), Ms. Mitchell testified the plaintiff would be unable to return to his past work of customer service as he did it or as it is performed in the national economy. (Tr. 58). She also

testified that, generally, for there to be transferrable skills into sedentary work, lifting of ten pounds would be required. (Tr. 58-59). Additionally, when the plaintiff's attorney asked Ms. Mitchell whether her determinations would change if the sitting requirements had to be performed in a reclined position, she stated that it would make it difficult to perform the job. (Tr. 61). The first and third hypotheticals, both of which involved the plaintiff lifting ten pounds and sitting for 30 minutes at a time, resulted in a finding that the plaintiff would be able to both return to his previous work in customer service and transfer skills to other employment. (Tr. 57-60).

There is no indication from the plaintiff's treating physicians as to his capabilities in the workforce. The only limitation ever submitted to the plaintiff was following the implantation of spinal chord stimulator. Dr. Severson instructed the plaintiff to lift no more than five pounds, but it is unclear whether this was a post-operation limitation or a permanent limitation. (Tr. 378). Because a "treating physician's opinion regarding an applicant's impairment will be granted controlling weight" and the disability determination service physicians never personally examined the plaintiff, an RFC assessment by one of the plaintiff's treating physicians is necessary in determining this crucial issue. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). Therefore, the case must be remanded to obtain an RFC from one of the plaintiff's treating physicians.

Improper Hypothetical

The plaintiff argues that the hypothetical relied upon by the ALJ in determining that the plaintiff could return to the workforce was improper because it did not completely describe the plaintiff's impairments. The plaintiff argues that the hypothetical was incorrect in two aspects: the amount of weight that the plaintiff can occasionally lift and the amount of time the plaintiff is able to sit in an upright position. This court agrees.

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263–64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of

jobs the claimant can perform.  <u>Newton v. Chater</u>, 92 F.3d 668, 694–95 (8th Cir. 1996).

The ALJ proposed three hypotheticals.  The first hypothetical was almost identical to the restrictions proposed by Dr. Cromer in his RFC assessment.  (Tr. 246).  The second hypothetical most closely reflected the limitations described by the plaintiff in his questionnaire in preparation for the ALJ hearing.  (Tr. 171).  The third hypothetical was similar to the restrictions proposed by Dr. May in his RFC assessment.  (Tr. 281-88). Ms. Mitchell testified that for the first and third hypotheticals the plaintiff could return to his previous employment and also transfer vocations into other sedentary employment. (Tr. 57-58, 60).  Ms. Mitchell testified in regards to the second hypothetical that the plaintiff would not be able to return to his previous work experience or transfer vocations, as all sedentary work definitions, as described in the DOT, required lifting of at least 10 pounds.  (Tr. 32).  The ALJ relied upon the third  hypothetical in determining that the plaintiff was able to return to his past relevant work as a customer service clerk and also able to make an adjustment to other sedentary work.  (Tr. 19).  On remand, the RFC assessment by the plaintiff's treating physician will have great bearing on whether the ALJ's hypothetical "precisely describes the claimant's impairments."  <u>Newton</u>, 92 F.3d at 694-95.  Thus, this issue should be remanded for a proper hypothetical including the plaintiff's limitations as found by his treating physician.

Upon the foregoing,

IT IS ORDERED that this matter is remanded to the Commissioner of Social Security to address and develop the record as it relates to an RFC determination by the plaintiff's treating physician and to create a proper hypothetical.

February 9, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT